**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, CHELSEA SCHRAMM, M.S. PA-C, and CHELSEA SCHRAMM, M.S. PA-C, individually, | ) ) ) ) ) | No. 12 C 8262 |
| PLAINTIFFS, | ) ) ) | |
| v. | ) ) | Judge Thomas M. Durkin |
| FOX VALLEY PHYSICAL SERVICES, S.C., an Illinois Medical Corporation, ROBERT W. BOER, D.C., PA-C, individually, MICHAEL DUNFORD, individually, PRIORITY HEALTH CHIROPRACTIC OF YORKVILLE, ILLINOIS, PAULA WEIHLER, individually, DONALD BAIERLE, individually, | ) ) ) ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chelsey Schramm, individually and on behalf of the United States of America, has sued two sets of defendants: (1) Fox Valley Physician Services, S.C. ("FVPS"), Robert W. Boer, Michael Dunford, and Donald Baierle (collectively, the "FVPS Defendants") and (2) Priority Health Chiropractic of Yorkville, Illinois ("Priority Health"), Paula Weihler, Stuart Weihler (collectively, the "Priority Health Defendants") alleging violations of the False Claims Act ("FCA"), payment under a mistake of fact, and unjust enrichment. The FVPS Defendants and Priority Health Defendants separately move to dismiss Schramm's Second Amended Complaint with prejudice, arguing that she has not alleged fraud with the particularity

1

required under Rule 9(b). For the foregoing reasons, Defendants' motions are denied.

**LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

Additionally, it is well-established that the FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule

2

9(b)." *Thulin v. Shopko Stores Operating Co., LLC,* 771 F.3d 994, 998 (7th Cir. 2014). Rule 9(b) requires a "plaintiff to do more than the usual investigation before filing [a] complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Ackerman v. Nw. Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir. 1999) (citations omitted). Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud, "which means the 'who, what, when, where, and how.'" *See United State ex rel. Lusby v. Rolls–Royce Corp.,* 570 F.3d 849, 853 (7th Cir. 2009) (citations omitted). However, "[t]o say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Id.* at 855 (emphasis in original).

To ensure that the courts and litigants do not "erroneously take an overly rigid view of the [Rule 9(b)] formulation," the Seventh Circuit has acknowledged that the "the requisite information . . . may vary on the facts of a given case." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 442 (7th Cir. 2011). Indeed, the Seventh Circuit has held that a plaintiff who does not have personal knowledge of particularized facts about the alleged fraud can nonetheless comply with Rule 9(b) if she pleads sufficient circumstantial evidence. *See Lusby,* 570 F.3d at 854-55. To that end, a plaintiff may sufficiently allege fraud on information and belief if "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for [her] suspicions." *Pirelli*,

631 F.3d at 443 (citation omitted).

## BACKGROUND

This Court previously dismissed without prejudice Schramm's Amended Complaint, granting her leave to replead with the particularity required by Rule 9(b). *See* R. 61 at 8 (instructing Schramm to provide particular details of a scheme to submit false claims paired with reliable indicia creating a strong inference that claims were actually submitted). Schramm timely filed a Second Amended Complaint, which sets forth the following allegations.

Schramm worked as a physician assistant ("PA") for Defendant FVPS for three months. R. 66 ¶ 7. Defendant Robert Boer is the President and owner of FVPS. *Id.* ¶ 10. Defendant Michael Dunford is the FVPS Office Manager, and he and FVPS employee Defendant Donald Baierle share responsibility for Medicare billing. *Id.* ¶¶ 13-14. Dr. Angelo Reyes, M.D. is an FVPS treating physician and an approved Medicare provider. *Id.* ¶ 44.

Before she was hired by FVPS, Schramm completed a two month clinical rotation there. *Id.* ¶ 44. During that time period, Boer and Dunford told Schramm that FVPS was looking to hire PAs like herself to work under physician supervision at "satellite" clinics like Defendant Priority Health in Yorkville in order to "better serve an ever increasing number of Medicare (and other) patients." *Id.* ¶ 45. Schramm was further informed by Boer and Dunford that FVPS handles all Medicare billings for its satellite clinics, including Priority Health, and that FVPS shares Medicare billing revenue with these clinics on a 50/50 basis. *Id.* ¶ 46.

Schramm began working as a PA at FVPS on July 9, 2012. *Id.* ¶ 47. The Illinois Physician Assistant Practice Act of 1987 ("IPAP") requires that all PAs work under duly authorized "Supervising Physicians." *Id.* ¶ 38. Boer instructed Schramm that Dr. Reyes would be her supervising physician. *Id.* ¶ 47. When Schramm began working at FVPS, she completed a "Supervisory Form" as required by IPAP and handed it to Dunford, who secured Dr. Reyes's signature and submitted the form to the State of Illinois. *Id.* ¶ 48, Ex. A. However, Dr. Reyes "was not on-site at FVPS nor was he actively involved . . . in providing a regime of medical care for [Schramm's] patients." *Id.* ¶ 54. Moreover, just weeks after her employment began, Schramm was notified by "the State of Illinois that she could not see or treat *any* patients as a PA in Illinois because Reyes . . . was ineligible to supervise her." *Id.* ¶ 58 (emphasis in original). Schramm brought this communication to the attention of Boer and Dunford. *Id.* ¶ 59. They told her they would look into the matter, but instructed her to continue working in the meantime. *Id.* ¶ 59. Neither Boer nor Dunford ever followed-up with Schramm on the issue. *Id.*

After her first week at FVPS's North Aurora location, Schramm was assigned to work at Priority Health. *Id.* ¶ 8-9. Priority Health is owned by Defendants Paula and Stuart Weihler. *Id.* ¶¶ 11-12. Mr. Weihler oversees Priority Health's billing. *Id.* ¶ 12. Mrs. Weihler and Leanne Walton are chiropractors there. *Id.* ¶ 56. Neither is an approved Medicare provider. *Id.* ¶ 64. Dr. Reyes worked with Schramm at Priority Health on her first two days only. Id. ¶ 55. Thereafter, he treated patients from a different FVPS satellite facility in Naperville. *Id.* ¶ 60.

5

Schramm alleges that FVPS and Priority Health receive a significant portion of their income from Medicare. *Id.* ¶¶ 20- 21. To participate in Medicare, providers, including physicians and non-physician practitioners ("NPPs"), must submit the required Medicare Enrollment Application Form and obtain approval from the Center for Medicare and Medicaid Services ("CMS"). *Id.* ¶ 20. Schramm submitted her CMS application form just prior to beginning her employment at FVPS. *See id.* ¶ 49. Dunford told Schramm that "since her CMS Application had been submitted, she could immediately begin to see and treat Medicare patients." *Id.* ¶ 48. Schramm did so, treating approximately 100 patients her first week at FVPS and approximately 60 patients at Priority Health every week thereafter. *Id.* ¶¶ 8, 53. "To the best of [Schramm's] knowledge, 80[%]-90% of her patients [at both locations] were Medicare covered." *Id.*

In addition to requiring provider registration, CMS promulgates various rules and regulations, which registered providers are required to understand and abide by. *Id.* ¶¶ 24-25. Among those rules and regulations are the following:

(1) Providers must provide economical medical services and then, only when medically necessary;

(2) Providers must only bill Medicare for reasonable and medically necessary services;

(3) Providers must not make false statements or misrepresentations of material facts concerning requests for payment;

(4) Providers must certify when presenting a claim that the service provided is a medical necessity; and

(5) Providers must support all claims with proper documentation.

*Id.* ¶ 24. When submitting bills for payment to Medicare, providers are required to

use numerical codes known as "CPT codes" to specify services provided. *Id.* ¶ 27. Medicare bills may be submitted electronically. *Id.* ¶ 33. A provider's electronic signature certifies that services were properly rendered and billed in compliance with all CMS rules and regulations. *Id.* ¶¶ 39-40.

Schramm alleges that certain medical services known as "incident to" services may be billed to Medicare by an approved physician even if those services are actually performed by an approved NPP working under the physician's supervision. *Id.* ¶ 35. When "incident to" medical services are billed under a physician's National Provider Identifier, they are reimbursed "at 100% of the Medicare Physician Fee Schedule amount," as opposed to the 85% reimbursement rate applied to services billed by NPPs. *Id.* ¶ 35. To qualify for full reimbursement as an "incident to" medical service, all of the following requirements must be met:

(1) The NPP must be an employee or independent contractor of the physician, physician's group, or physician's employer;

(2) The physician must see the Medicare patient first on the initial visit and for any new problem to establish a diagnosis and treatment plan;

(3) The physician must provide direct personal supervision to the NPP by being on-site in and immediately available to render assistance to the NPP should it become necessary; and

(4) The physician must continue to see the Medicare patient at a frequency that reflects active participation in the ongoing management of the patient's care.

*Id.* ¶¶ 36-37.

Schramm never had responsibility for billing at either FVPS or Priority Health. *Id.* ¶ 47. However, she was trained on electronic data entry for purposes of generating electronic Medicare bills. *Id.* ¶¶ 44, 57. Though Schramm asked for her

7

own passcode to the electronic medical record ("EMR") system to enable her to bill for services rendered under her own signature, *id.* ¶ 50, Dunford instructed her to use Dr. Reyes's passcode to input information in patient EMRs, electronically signing his name to each entry instead of hers, *id.* ¶ 51. Dunford told Schramm simply to add the notation, "Patient seen and examined by Chelsey Schramm, PA-C" to the billing entries. *Id.* In her Second Amended Complaint, Schramm lists ten Medicare patients she treated at Priority Health whose names are known to her but were withheld to protect confidentiality. *Id.* ¶ 62. The list includes the dates on which Schramm treated the patients and the codes she entered in their EMRs for billing. *Id.*

In addition to inputting her own Medicare patients' EMRs under Dr. Reyes's signature, Schramm inputted EMRs for Mrs. Weihler and Walton's Medicare patients, as well. According to Schramm, the Priority Health chiropractors recorded services rendered to Medicare patients on "Green Slips." *Id.* ¶ 64. Schramm was instructed to enter the codes marked on the Green Slips in her own EMRs, "ma[king] it appear that [Schramm] and/or [Dr.] Reyes . . . had actually performed the subject procedures." *Id.* ¶ 65. Schramm estimates that she entered billing data in this way for between ten and twenty Medicare patients daily who were seen and treated by her non-CMS approved colleagues, Mrs. Weihler and Walton. *Id.* ¶ 66. Further, she asserts that she was instructed not to place the Green Slips in patient files, but rather to return them to the front desk employees each day, which she did.

8

*Id.* ¶ 65.[1]

Finally, Schramm alleges that "starting in August of 2012," she began noticing CPT codes in her Medicare EMRs that she had not entered. *Id.* ¶ 67. She alleges that Mr. Weihler admitted to her that he accessed her Medicare EMRs around that time. *Id.* ¶ 68.[2] Schramm alleges to have raised concerns about this with Dunford, who responded that Mr. Weihler's access to Schramm's EMRs was authorized by FVPS. *Id.* ¶ 69.

Schramm alleges that on October 3, 2012, Bairle informed her that her CMS application had been approved. He told her that "all of her Medicare patient billings for FVPS and Priority Health had been held pending CMS approval," and would now be submitted for payment. *Id.* ¶ 61.[3] Schramm resigned the following week. *Id.*

---

[1] Schramm attaches one sample Green Slip to her complaint. *Id.* Ex. B. The slip is dated October 5, 2012, just days before she resigned. *Id.* The patient's name is redacted from the slip to protect confidentiality. *Id.* The slip contains several CPT codes and various notes about the services rendered. *Id.* It is unclear from the face of the slip who filled it out, and Schramm only avers generally that "Green Slips . . . were generated by P. Weihler and Walton." *Id.* ¶ 66.

[2] Mr. Weihler testifies in an affidavit submitted in support of a withdrawn motion for sanctions that he never accessed Schramm's EMRs and that he did not have the usernames and passwords required to alter the EMRs as alleged. R. 68-2 ¶¶ 4-9. The affidavit is not properly considered on a motion to dismiss and plays no role in the Court's analysis.

[3] In a footnote to the memorandum in support of their motion, the FVPS Defendants state that "Schramm's services were only billed as 'incident to' when all criteria were met. Otherwise, her services were billed under her name, and, therefore, payable at the 85% rate as provided from [*sic*] under CMS rules." R. 70 at 6-7, fn. 2. The FVPS Defendants submit no proof of this contention and concede that this information "is not relevant to a 12(b)(6) motion." *Id.* The Court therefore does not consider it except to note the concession that bills were submitted to Medicare from Schramm's EMRs.

¶ 8.

Based on these facts, Schramm alleges that during the period of her employment (though "possibly" before and "likely" after), Defendants submitted three types false claims for payment by Medicare: (1) bills for services rendered by a PA who had not yet obtained CMS approval and who was not duly supervised by an authorized physician; (2) bills for services rendered by non-CMS-approved chiropractors; and (3) bills for services not rendered at all.

Schramm does not attach to the Complaint any invoices billed to Medicare, nor does she set forth any allegations regarding claims submitted, reimbursement sought, or amounts paid to Defendants by Medicare. She states that all such information is "in Defendants' possession and [her] attempts to obtain [the] same from Defendants and CMS have been stymied." R. 75 at 2.

## ANALYSIS

Though Defendants move separately for dismissal, they assert essentially the same argument—that Schramm's failure to allege a single fact regarding an actual bill sent to or paid by Medicare is fatal to her claim.[4] R. 68 ¶ 8; R. 70 at 4, 6, 8-9; R. 76 at 4; R. 77 at 3-4, 5, 7. They repeat this objection despite expressly

---

[4] Defendants do not differentiate between Schramm's five FCA claims or separately argue the viability of the payment under mistake of fact or unjust enrichment claims under Rule 12(b)(6). The Court therefore considers that all of the claims rise or fall together, depending on whether Schramm has adequately pled a scheme to defraud Medicare. *See Pirelli*, 631 F.3d at 447-48 (explaining that "it is allegations of fraud, not claims of fraud, to which Rule 9(b) applies") (holding that where fraud was insufficiently pled in a consumer protection matter and unjust enrichment was not pled in the alternative, the corollary unjust enrichment claim necessarily failed and was properly dismissed with the rest of the suit).

acknowledging that the Seventh Circuit held in *United States ex rel. Lusby v. Rolls-Royce Corporation*, 570 F.3d at 854, that it is not essential for a relator in an FCA case to produce invoices at the outset of a suit, particularly when those invoices are exclusively within the defendant's custody and control. R. 76 at 3. The rule in *Lusby* is clear: "It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Id.* at 854-55 (citing authority).

Schramm's accusations as set forth in the Second Amended Complaint are not vague. Schramm now alleges, in detail, that from July to October 2012, at the individual defendants' express instruction and for the corporate defendants' benefit, she treated dozens (perhaps hundreds) of Medicare patients before obtaining CMS approval to do so and without the required physician supervision. Unlike the previously dismissed complaint, the Second Amended Complaint identifies ten such patients. Further, the Second Amended Complaint alleges that as of late July or early August 2012, Boer and Dunford were informed that even if present, Dr. Reyes was ineligible to supervise Schramm under Illinois law.

The Second Amended Complaint also details a scheme Schramm participated in at the Weihlers' instruction (and with FVPS's knowledge) to enter billing data for Medicare patients from Green Slips, one of which Schramm attached to the Second Amended Complaint as an example. Schramm alleges she entered billing data in this way for up to twenty Medicare patients each day whom she never treated, but

11

who were seen instead by her non-CMS-approved colleagues at FVPS.[5] The Second Amended Complaint describes this scheme by reference to particular conversations, even going as far as to detail how Schramm was instructed to dispose of the Green Slips.

Schramm also alleges that all of her EMR entries, including those for patients she herself never saw, were made under Dr. Reyes's signature at Boer's instructions, making it appear as though Dr. Reyes either administered the treatments or supervised their administration, when neither was true (save possibly for services performed by Schramm at Priority Health from July 17-19, 2012). Schramm alleges that beginning in August 2012, Mr. Weihler began altering her Medicare EMRs to include services never rendered at all. And Schramm alleges by reference to a specific conversation not detailed in the previous complaint that Bairle was aware of this.[6]

---

[5] The Defendants also argue that because Schramm has not alleged that any of the services marked on the Green Slips were not medically necessary or not performed as indicated, she has not adequately alleged a fraud in the Green Slip scheme. This misunderstands Schramm's theory. Defendants are correct that Schramm does not allege that the chiropractors dishonestly filled out the Green Slips. Rather, she alleges that Medicare would not reimburse for the medical services recorded on the Green Slips—even if medically necessary and actually performed—because the Priority Health chiropractors were not CMS-approved medical providers. Schramm alleges that defendants knew this, and thus had her enter the treatment information in the EMR system as though she and/or Dr. Reyes had administered the services in order to improperly seek (and presumably accept) payment from Medicare. Simply put, it is the recording of the services and not the provision of the services that constitute the alleged fraud.

[6] While Defendants attack the thoroughly-described Green Slip scheme, oddly, they do not argue the inadequacy of the claim that Mr. Weihler added CPT codes for unperformed work to Schramm's EMRs. The Court is concerned about the lack of detail pled on this aspect of the claim. For example, Schramm does not identify

Finally, the Second Amended Complaint clarifies that all of Schramm's Medicare EMRs (including those recording services performed by her colleagues or by no one at all) were held by FVPS and Priority Health until after her CMS authorization was approved. More specifically, the Second Amended Complaint details a conversation between Schramm in Bairle on October 3, 2012 in which Bairle informed Schramm that all such claims would "now" be submitted to Medicare for payment (whether as "incident to" services or otherwise).

The "who, what, when, where, and how" are now explicit, and the deficiencies of the previous complaint are cured. That Schramm fails to attach an actual claim submitted to Medicare or proof-of-payment received by defendants is of no moment. She has plausibly alleged a scheme to defraud the government and the defendants are adequately on notice of the false claims and misconduct alleged.

In arguing for dismissal, Defendants rely primarily on three cases. The first supports the adequacy of Schramm's pleading, the second is distinguishable, and the third is entirely inapposite. In *United States ex rel. Grant v. Thorek Hospital*, 2008 WL 1883454 (N.D. Ill. Apr. 25, 2008), Judge Anderson suggested a variety of details a relator could plead to sustain her FCA claim:

> [D]etails concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and

---

what CPT codes she allegedly noticed were added to her EMRs, how many codes were added to any given EMR or how frequently her EMRs were allegedly altered. In failing to assert this argument, however, Defendants have waived it, and Schramm may proceed with discovery on this aspect of the alleged fraud. The argument can be asserted again if Defendants file for summary judgment.

13

> the length of time between the alleged fraudulent practices and the submission of claims based on those practices.

*Id.* at *2 (citing authority). In so doing, Judge Anderson expressly noted that "[w]hile this is not a list of requirements, providing the details set forth above is helpful to the court when evaluating whether a relator has stated a claim with particularity." *Id.*

Unlike the relator in *Grant*, Schramm alleges details regarding the dates of the allegedly fraudulent claims (July – October 2012), she provided representative examples of the services for which the government was billed, and she alleges that Bairle informed her that he would be submitting her earlier-entered Medicare EMRs for payment after her CMS authorization was approved on October 3, 2012. Schramm also alleges facts regarding the individual defendants' knowledge and specific acts in furtherance of the scheme. With respect to the Green Slip scheme, Schramm alleges in a step-by-step fashion how the scheme was executed. Even without reference to bills or claim identification numbers, these claims are alleged with particularity under the standard set forth in *Grant*.

Defendants also cite the opinion of Judge Reinhard in *Peterson v. Community General Hospital*, 2003 WL 262515 (N.D. Ill. Feb. 7, 2003). The alleged fraud in *Peterson* was a "self-referral" (kickback) scheme in violation of Medicare guidelines, and the complaint at issue "made only the sketchiest allegations" regarding how that scheme was executed. More specifically, the relator alleged that the defendant hospital paid physician salaries in excess of market demands in exchange for the physicians' exclusive referral of Medicare patients to the defendant institution. *Id.*

at *2. Notably absent from the relator's complaint were any allegations regarding particular Medicare patients seen by the physicians, including when those patients were seen, what type of services were rendered, how their claims were submitted to Medicare, and what exactly was certified as being in compliance with applicable Medicare guidelines. *Id.* Finding the lack of detail fatal to the relator's claim (but granting him leave to amend), Judge Reinhard instructed, "To be clear, the court does not expect relator to list every single claim or document involved, but he must provide at least some representative examples." *Id.*

This case is distinguishable from *Peterson*. For one, Schramm *does* provide representative examples. She anonymously identifies ten Medicare patients she treated without CMS approval and without legally required physician supervision, whose treatment she recorded under Dr. Reyes's signature, and whose electronic records were accessible to and alterable (and in some cases possibly altered) by certain of the defendants. Moreover, unlike the relator in *Peterson*, Schramm alleges a more concrete scheme, providing detail regarding the participants, their knowledge of bad acts, the timeframe in which the scheme took place, the content of the alleged fraud, the approximate number of Medicare patients at issue and the type of services claimed, and the date when the allegedly fraudulent claims were submitted to Medicare. It is true that Schramm does not identify any particular claims or attach any documents showing false certifications of compliance. However, given the significant distinctions between this case and the scheme and detail alleged in *Peterson*, Schramm's allegations are sufficient to survive pre-discovery

dismissal.

Finally, Defendants direct the Court to the Seventh Circuit's opinion in *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730 (7th Cir. 2007). Specifically, they cite the Seventh Circuit's requirement in *Fowler* of "evidence *at an individualized transactional level*" to sustain an FCA claim. *Id.* at 742 (emphasis in original). But the scheme alleged in *Fowler* was so different from the scheme alleged here that it renders the Seventh Circuit's holding inapplicable. In *Fowler*, the relators alleged that the defendant was double-billing Medicare for returned prescriptions. *Id.* Central to the relators' claim, therefore, was evidence that the cost of returned medications was not refunded to Medicare and that it was claimed again when the medications were redistributed. Evidence of particular claims, returns, and subsequent charges for the same product was therefore critical to the survival of the relators' third amended complaint. Explaining the centrality of these facts, the court explained that "[t]he relators err by assuming, without any support, that once a prescription was returned, [the defendant] either kept the money or continued to bill without providing an appropriate credit to the government or replacement prescription." *Id.* This erroneous assumption was fatal to the relators' suit.

But the same logic does not apply here. The present scheme does not require proof at an "individualized transaction level" because Schramm alleges a fraud that does not depend on the accounting mechanics of any particular Medicare claim. Rather, it depends on an allegedly wrongful system for (a) treating Medicare

16

patients (e.g., by an NPP without CMS-approval and legally-required physician supervision); (b) electronically recording that treatment in a system used to generate Medicare bills (e.g., using a CMS-approved physician's credentials to make it appear as though he rendered or supervised the claimed treatment when he did not); and (c) reviewing and altering electronic patient records (e.g., to add codes to Medicare bills for services never rendered). This system has been alleged in adequate detail. *Fowler* is inapposite and does not require dismissal here.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss [68] [69] are denied. Defendants are instructed to answer by March 3, 2016. A revised joint initial status report with updated discovery deadlines is to be filed by March 10, 2016. A status hearing is set for March 14, 2016 at 9:00 a.m.

ENTERED:

*Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: February 11, 2016